## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

Civil Action No. <u>3:25-cv-479</u>-DPJ-ASH

---

**CHARLES CRAWFORD, JASON KELLER,
BLAYDE GRAYSON, ALAN WALKER,
WILLIE MANNING, and all others similarly
situated,**

                **Plaintiffs,**

*v.*


**NATHAN "BURL" CAIN, Commissioner,
Mississippi Department of Corrections, in his official
capacity; DERRICK GARNER, Deputy Commissioner
of Administration and Finance, Mississippi Department
of Corrections, in his official capacity; JOHN HUNT,
Deputy Commissioner of Institutions, Mississippi
Department of Corrections, in his official capacity;
MARC McCLURE, Superintendent, Mississippi State
Penitentiary, in his official capacity; MISSISSIPPI
STATE EXECUTIONER, in his official capacity; and
capacity and UNKNOWN EXECUTIONERS, in their
official capacities,**

                **Defendants.**

---

## CLASS ACTION COMPLAINT FOR
## EQUITABLE AND INJUNCTIVE RELIEF

## I.      NATURE OF ACTION

1.      Plaintiffs Charles Crawford, Jason Keller, Blayde Grayson, Alan Walker, and

Willie Manning ("Named Plaintiffs"), for themselves and all others similarly situated, bring this

action pursuant to 42 U.S.C. § 1983 for violations and threatened violations of their rights to due

1

process and to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

2.      Mississippi statutory law governing the method of execution of death sentences in the state is codified at Miss. Code Ann. § 99-19-51. On July 1, 2022, Miss. Laws 2022, Ch. 414 (H.B. No. 1479) ("Amended Statute"), which amended § 99-19-51, took effect.

3.      The Mississippi Department of Corrections ("MDOC"), at the direction of Defendant Nathan "Burl" Cain ("Defendant Cain"), issues written policies ("execution protocols") to give direction to individuals participating in an execution. The most recent of these policies is "Mississippi Department of Corrections, Capital Punishment Procedures (rev. May 28, 2025)" ("2025 Execution Protocol").

4.      Defendants, individually and together, have developed practices, customs, and usages which are employed during the course of an execution in Mississippi ("execution practices"); some of these practices are more specific than the actions detailed in the 2025 Execution Protocol and previous iterations of MDOC execution protocols; others are contrary to the express language of the applicable execution protocol.

5.      This civil action alleges that the Amended Statute, together with Defendants' execution protocols and execution practices, both individually and together, violate the Eighth and Fourteenth Amendment rights of the Named Plaintiffs and of the class of persons who are now, or who may be in the future, held in the custody of MDOC under sentence of death, and who are not currently plaintiffs in Jordan, et al., v. Cain, et al., No. 3:15-cv-295-HTW-LGI in the United States District Court for the Southern District of Mississippi ("Putative Class Plaintiffs").

2

6.      Named Plaintiffs seek preliminary and permanent injunctive relief to prevent the Defendants from inflicting cruel and unusual punishment upon them during their executions, and from violating the federal constitutional rights of Named Plaintiffs and Putative Class Plaintiffs.

## II.    JURISDICTION AND VENUE

7.      Plaintiffs' claims arise under the Constitution and laws of the United States. This Court has original federal question jurisdiction over those claims arising under the Constitution and laws of the United States pursuant to 28 U.S.C. §§ 1331, 1343.

8.      This Court has the authority to grant declaratory and injunctive relief under 28 U.S.C. § 2201-2202 and Fed. R. Civ. P. 57 and 65. The federal rights asserted by Named Plaintiffs are enforceable under 42 U.S.C. § 1983.

9.      Venue is proper in the Southern District of Mississippi under 28 U.S.C. §§ 1391(b)(1) and 1391(c)(2). With respect to Section 1391(b)(1), Defendant Cain's principal place of business is located in Jackson, Hinds County, Mississippi, in the Southern District of Mississippi. With respect to Section 1391(c)(2), all Defendants in this action shall be served with process by service on the Attorney General of Mississippi in Jackson, Hinds County, Mississippi, pursuant to Miss. R. Civ. P. 4(d)(5), incorporated through Fed. R. Civ. P. 4(e)(1).

## III.    PARTIES

10.      Plaintiff Charles Crawford is a resident and citizen of the United States and of the State of Mississippi, and is currently incarcerated under a sentence of death at the Mississippi State Penitentiary in Parchman, Mississippi.

11.      Plaintiff Jason Keller is a resident and citizen of the United States and of the State of Mississippi, and is currently incarcerated under a sentence of death at the Mississippi State Penitentiary in Parchman, Mississippi.

3

12.    Plaintiff Blayde Grayson is a resident and citizen of the United States and of the State of Mississippi, and is currently incarcerated under a sentence of death at the Mississippi State Penitentiary in Parchman, Mississippi.

13.    Plaintiff Alan Walker is a resident and citizen of the United States and of the State of Mississippi, and is currently incarcerated under a sentence of death at the Mississippi State Penitentiary in Parchman, Mississippi.

14.    Plaintiff Willie Manning is a resident and citizen of the United States and of the State of Mississippi, and is currently incarcerated under a sentence of death at the Mississippi State Penitentiary in Parchman, Mississippi.

15.    The Putative Class Plaintiffs are all persons who are now, or who may be in the future, held in the custody of MDOC under sentence of death, and who are not currently plaintiffs in Jordan, et al., v. Cain, et al., No. 3:15-cv-295-HTW-LGI in the United States District Court for the Southern District of Mississippi. All of the Putative Class Plaintiffs are residents of the United States and of the State of Mississippi.

16.    Defendant Burl Cain is the Commissioner of MDOC.

17.    MDOC is the state agency charged with the incarceration, care, custody, and treatment of all state prisoners, including prisoners sentenced to death. Miss. Code Ann. §§ 47-5-10(a); 47-5-23.

18.    Defendant Cain is the executive, administrative, and fiscal officer of MDOC, establishes the general policy of MDOC, and oversees the administration of all affairs within MDOC. Miss. Code Ann. §§ 47-5-20(a); 47-5-23; 47-5-24(1).

19.     As the Commissioner of the MDOC, Mr. Cain must perform "[a]ll duties and necessary acts pertaining to the execution of a convict . . . except where such duties and actions are vested in the state executioner." Miss. Code § 99-19-53. *See also* § 99-19-55.

20.     Defendant Cain is responsible for ensuring that all prisoners committed to the custody of MDOC are treated in accordance with the United States and Mississippi Constitutions.

21.     At all relevant times, Defendant Cain has been acting under the color of law and as the agent and official representative of MDOC, pursuant to MDOC's official policies and procedures. He is sued in his official capacity only.

22.     Defendant Derrick Garner is Deputy Commissioner of Administration and Finance of MDOC. On information and belief, Defendant Garner reports directly to Defendant Cain. On information and belief, Defendant Garner serves at the will and pleasure of Defendant Cain.

23.     At all relevant times, Defendant Garner has been acting under the color of law and as an agent and official representative of MDOC, pursuant to MDOC's official policies and procedures. He is sued in his official capacity only.

24.     Defendant John Hunt is Deputy Commissioner of Institutions for MDOC. On information and belief, Defendant Hunt reports directly to Defendant Cain. On information and belief, Defendant Hunt serves at the will and pleasure of Defendant Cain.

25.     At all relevant times, Defendant Hunt has been acting under the color of law and as an agent and official representative of MDOC, pursuant to MDOC's official policies and procedures. He is sued in his official capacity only.

26.     Pursuant to the Amended Statute, Miss. Code Ann. § 99-19-51(1), Defendants Cain, Garner, and Hunt have the duty to select, in their discretion, the method of execution for any of the Named Plaintiffs or Putative Class Plaintiffs who are scheduled for execution.

27.     Defendant Marc McClure is the Superintendent of the Mississippi State Penitentiary in Parchman, Mississippi, the prison that houses all male death row prisoners, and the prison where all executions take place in the State of Mississippi. Miss. Code Ann. § 99-19-55(1).

28.     Defendant McClure is responsible for implementing MDOC's policies and procedures governing executions, managing the preparations for an execution, and for turning over the execution site to the State Executioner to perform the execution.

29.     Defendant McClure is also responsible for protecting the constitutional rights of all persons incarcerated at Parchman, and/or transported to Parchman for an execution.

30.     At all relevant times, Defendant McClure has been acting under color of law and as an agent and official representative of the Mississippi State Penitentiary and MDOC. He is sued in his official capacity only.

31.     The State Executioner of the State of Mississippi is appointed by the Governor and shall supervise and inflict the punishment of death pursuant to Miss. Code Ann. §99-19-53. The name of the State Executioner is withheld from the public by the State of Mississippi.

32.     The names of Defendants Unknown Executioners are unknown to Plaintiffs, but they include the State Executioner, his or her designee, and members of the State Execution Team. On information and belief, the Unknown Executioners will participate in the process of the execution by virtue of their roles in designing, implementing, carrying out, and/or

supervising the lethal injection process, including the procurement and storage of lethal injection drugs and materials. Miss. Code Ann. §§ 99-19-53, 99-19-55(2).

33.    At all relevant times, Defendants State Executioner and Unknown Executioners have been acting under the color of law. They are sued in their official capacities only.

## IV.    FACTS COMMON TO ALL CLAIMS

**A.    The 2022 Amendments to Miss. Code Ann. § 99-19-51 made significant changes to the authorized execution methods in Mississippi and the manner in which the method of any particular execution is selected.**

34.    On July 1, 2022, the Amended Statute went into effect. Among other things, the 2022 amendments made significant changes in the authorized methods of execution, the manner in which the method of execution in any particular case is selected, and the manner and time in which a death-sentenced prisoner is notified of the method selected for their execution.

35.    Under the Amended Statute, the method used to execute the death sentence in any particular case is chosen by the Commissioner, the Deputy Commissioner of Administration and Finance, and the Deputy Commissioner of Institutions.

36.    Under the Amended Statute, "the manner of inflicting the punishment of death shall be by one of the following: (a) intravenous injection of a substance or substances in a lethal quantity into the body; (b) nitrogen hypoxia; (c) electrocution; or (d) firing squad, until death is pronounced by the county coroner where the execution takes place or by a licensed physician according to accepted standards of medical practice."

37.    The Amended Statute provides that the policy of the State of Mississippi is "that intravenous injection of a substance or substances in a lethal quantity into the body shall be the preferred method of execution." What weight, if any, is required to be given to this preference by

the Commissioner and the Deputy Commissioners in their choice of execution method is not

explained.

38.     Prior to July 1, 2022, Section 99-19-51(1) through (4) provided:

(1) The manner of inflicting the punishment of death shall be by the sequential intravenous administration of a lethal quantity of the following combination of substances: (a) an appropriate anesthetic or sedative; (b) a chemical paralytic agent; and (c) potassium chloride, or other similarly effective substance, until death is pronounced by the county coroner where the execution takes place or by a licensed physician according to accepted standards of medical practice. As used in this section, the term "appropriate anesthetic or sedative" means any substance that, if properly administered in a sufficient quantity, is likely to render the condemned prisoner unconscious, so that the execution process should not entail a substantial risk of severe pain.

(2) If the method of execution authorized in subsection (1) of this section is held unconstitutional by a court of competent jurisdiction or is otherwise unavailable, then the sentence of death shall be carried out by nitrogen hypoxia.

(3) If the methods of execution authorized in subsections (1) and (2) of this section are held unconstitutional by a court of competent jurisdiction or are otherwise unavailable, then the sentence of death shall be carried out by electrocution.

(4) If the methods of execution authorized in subsections (1), (2) and (3) of this section are held unconstitutional by a court of competent jurisdiction or are otherwise unavailable, then the sentence of death shall be carried out by firing squad.

39.     Thus, under the statute before July 1, 2022, lethal injection was the only

authorized method of execution in Mississippi, unless it was "held unconstitutional by a court of

competent jurisdiction" or was "otherwise unavailable." Then and only then, in the pre-July 1,

2022 statute, was nitrogen hypoxia an authorized method of execution. Each of the other

potential methods of execution would be similarly authorized if and only if the methods listed

above it in the statute were "held unconstitutional by a court of competent jurisdiction" or were

"otherwise unavailable."

40.     As of July 1, 2022, the Commissioner and Deputy Commissioners may select any of the four authorized execution methods, regardless of the availability of the other authorized methods, and without being constrained by the previously required order of methods.

41.     Other than as set forth in Section 99-19-51(1), as amended, the discretion of the Commissioner and the Deputy Commissioners to select among the authorized methods in the Amended Statute is unlimited.

42.     Further, under the statute before July 1, 2022, the authorized method of lethal injection was a three-drug series consisting of (a) an appropriate anesthetic or sedative; (b) a chemical paralytic agent; and (c) potassium chloride or other similarly effective substance.

43.     Also, under the statute before July 1, 2022, the term "appropriate anesthetic or sedative" was limited to "any substance that, if properly administered in a sufficient quantity, is likely to render the condemned prisoner unconscious, so that the execution process should not entail a substantial risk of severe pain."

44.     The Amended Statute discarded the limitations on lethal injection set forth in the preceding two paragraphs. In their place, the Amended Statute authorizes the "intravenous injection of a substance or substances in a lethal quantity into the body."

45.     The Amended Statute also added the requirement that "[u]pon receipt of the warrant of execution from the Mississippi Supreme Court, the Commissioner of Corrections shall, within seven (7) days, provide written notice to the condemned person of the manner of execution."

**B.      MDOC's Protocol, as written, limits the method of execution to a three-drug lethal injection series, with the authorized drugs for each step being further limited.**

46.     The 2025 Execution Protocol promulgated under the supervision of Defendant Cain calls for the serial administration of three drugs to put a prisoner to death.

9

47.     The 2025 Execution Protocol requires the use of Sodium Pentothal as the first drug in the series, but provides for the use of pentobarbital "[i]n the event of an unavailability of a sufficient quantity of sodium pentothal from available sources." Further, the protocol provides for the use of midazolam "[i]n the event of an unavailability of a sufficient quantity of pentobarbital from available sources."

48.     The second drug is a chemical paralytic blocking agent that paralyzes all of the prisoner's voluntary muscles, including the muscles used for respiration, but does not suppress sensation, consciousness, cognition, or the ability to feel pain and suffocation.

49.     The 2025 Execution Protocol requires the use of Pavulon as the second drug in the series, but provides for the use of vecuronium bromide or rocuronium bromide "[i]n the event of unavailability of a sufficient quantity of Pavulon from available sources."

50.     The third and final drug in the 2025 Execution Protocol is potassium chloride – a chemical that disrupts the electrical signals in the heart, paralyzes the cardiac muscle, and kills the prisoner by cardiac arrest.

C.     **The 2025 Execution Protocol proposed the performance of a consciousness check between the first and second drug injections of an execution, but does not include other safeguards used by the few jurisdictions that continue to use a three-drug protocol.**

51.     The 2025 Execution Protocol includes a "Proposed Consciousness Check" to be conducted between the first and second injections in the three-drug series.

52.     The relevant provision of the 2025 Execution Protocol states, "[w]hen four (4) minutes have elapsed following the administration of the first drug in the protocol, the IV Team leader, dressed in a manner to preserve their anonymity, shall enter into the room where the offender is located to determine, pursuant to necessary and medically appropriate and approved

methods, whether the offender is unconscious. The IV Team leader shall also confirm that the IV line remains affixed and is functioning properly."

53.    A further paragraph in the "Proposed Consciousness Check" section of the 2025 Execution Protocol states, "[t]hroughout the entire procedure, the IV Team members, and other Execution Team members shall continually monitor the prisoner using all available means to ensure that the prisoner remains unconscious and that there are no complications."

54.    Other jurisdictions that continue to use the three-drug protocol employ additional safeguards. These include, among other things, provisions governing:

    a.  the qualification and vetting of members of the execution team;

    b.  review of the medical condition of the condemned prisoner to identify any necessary accommodations or contingencies that may arise from the prisoner's medical condition or history;

    c.  conducting a pre-execution assessment of intravenous access; and

    d.  use of a debriefing and quality assurance process.

55.    Although Defendants, or their predecessors in office, were given notice in 2016 that other three-drug lethal injection jurisdictions employed these safeguards, Defendants failed to implement them in the 2025 Execution Protocol and the three execution protocols promulgated in 2017, 2021, and 2022.

**D.    In previous executions in 2021, 2022, and 2025, Defendants' practices significantly deviated from the stated language of the execution protocol then in effect.**

56.    In the executions of David Cox in November 2021 and Thomas Loden in December 2022, Defendants deviated from clear language in the then-applicable execution protocols.

11

57.    In November 2021, the applicable protocol proposed that, after injection of the first drug, the executioners would wait four minutes, and then determine, "pursuant to necessary and medically appropriate and approved methods," whether the condemned prisoner had been rendered unconscious. At the same time, the protocol instructed that the executioners "confirm that the IV line remains affixed and is functioning properly."

58.    During Mr. Cox's execution on November 17, Defendants injected vecuronium bromide only two minutes after the injection of midazolam, and potassium chloride two minutes after that.  Thus, rather than waiting four minutes after injecting midazolam and then conducting a consciousness check and an IV-line check before proceeding further, MDOC had administered all three execution drugs within the space of four minutes, noting only the observance of a "4-minute wait period" after the injection of the third drug, potassium chloride.

59.    A witness to Mr. Cox's execution later testified by declaration that "[n]one of those standing around Mr. Cox in the execution chamber touched Mr. Cox. I did not see their mouths move, nor did I hear any speech from the officials around Mr. Cox," and "[b]etween the time the curtain parted and when the coroner pronounced Mr. Cox's death, nobody entered or left the execution chamber."

60.    Thus, neither the consciousness check nor the IV-line check were conducted during the execution of David Cox.

61.    In Defendants' 2022 Protocol, the opening sentence of the "Proposed Consciousness Check" was changed to direct that the consciousness check be conducted after the last of the three drugs has been administered. During the execution itself, all three drugs were administered within three minutes of the injection of midazolam, with no indication of any

consciousness check or IV-line check between the administration of midazolam and that of vecuronium bromide.

62.     A witness to Mr. Loden's execution testified by declaration that "once the curtain was opened to begin the execution, nobody entered or left the chamber. None of the persons present in the execution chamber touched Mr. Loden at all during the process. I did not hear anyone say anything during the process, other than Mr. Loden's last words and the pronouncement of death."

63.     Again, then, neither the consciousness check nor the IV-line check were conducted during the execution of Thomas Loden.

64.     On June 25, 2025, Defendants executed Richard Jordan. Statements in media reports discuss entry into the execution chamber of a man in a ball cap and sunglasses, who rubbed Mr. Jordan's chest, stated that "in my professional opinion," Mr. Jordan was unconscious, and then left the execution chamber.

65.     On information and belief, the process described during Mr. Jordan's execution did not comply with the 2025 Execution Protocol's requirement that Defendants determine, "pursuant to necessary and medically appropriate and approved methods," whether Mr. Jordan had been rendered unconscious. Nor did the executioners confirm that the IV-line they inserted into Mr. Jordan remained affixed and was functioning properly.

**E.     The notice of method of execution required by the Amended Statute has been given three weeks or less from the scheduled execution date.**

66.     The Amended Statute requires that the Commissioner provide the condemned prisoner notice, seven days after receipt of the execution warrant, of the method with which that prisoner will be executed.

67.    Mississippi has executed two individuals in the time since the effective date of the Amended Statute: Thomas E. Loden, Jr., on December 14, 2022, and Richard Jordan on June 25, 2025.

68.    On November 17, 2022, the Mississippi Supreme Court entered its order setting the execution of Mr. Loden on December 14, 2022.

69.    On November 23, 2022, twenty-one days before the scheduled execution, Mr. Loden was given Defendant Cain's notice stating, "the manner of execution will be an intravenous injection of a substance or substances in a lethal quantity into the body."

70.    On May 1, 2025, the Mississippi Supreme Court issued its order setting the execution of Mr. Jordan on June 25, 2025.

71.    On June 6, 2025, nineteen days before the scheduled execution, Mr. Jordan was given Defendant Cain's notice stating, "the manner of execution will be an intravenous injection of a substance or substances in a lethal quantity into the body."

**F.    Defendants' protocol and practices in administering lethal injection executions present substantial risks of severe pain to the Named Plaintiffs and Putative Class Plaintiffs.**

72.    The drugs used in Mississippi's lethal injection protocol have known and documented risks about which the Defendants are, or should be, aware.

73.    The first risk is associated with the administration of vecuronium bromide or rocuronium bromide, the drugs most recently used by Defendants to serve as the paralytic agent in the 2025 protocol.

74.    Either vecuronium bromide or rocuronium bromide cause paralysis of all voluntary muscles, including the lungs and diaphragm.

75.     If vecuronium bromide or rocuronium bromide is administered to a prisoner who is still conscious and able to feel pain, they will suffocate to death while experiencing the agonizing and conscious urge to breathe.

76.     Thus, if a prisoner is injected with vecuronium bromide or rocuronium bromide before they are fully anesthetized and rendered insensate, the prisoner will experience conscious paralysis and suffocation.

77.     However, because the prisoner is completely paralyzed and unable to talk, move, or make facial expressions as a result of being paralyzed, their pain and agony will be completely masked and concealed to observers.

78.     There is no legitimate penological justification for the use of a neuromuscular blocking agent or other chemical paralytic agent in an execution by lethal injection.

79.     Neuromuscular blocking agents are not necessary to produce death, and do not diminish the prisoner's awareness of and ability to feel pain.

80.     Well over one hundred executions have been accomplished in other jurisdictions in the United States without the use of a neuromuscular blocking agent or other chemical paralytic agent. In each of these executions, the prisoner died.

81.     The only purpose of the neuromuscular blocking agent in Defendants' lethal injection protocol is to mask the gasping and physical convulsions produced by injection of the final drug, potassium chloride.

82.     The neuromuscular blocking agent is thus used to make the execution appear serene and peaceful where the State may have in fact failed to sufficiently anesthetize the prisoner against pain and suffering.

15

83.    The second known risk associated with the drugs used in the Mississippi lethal injection protocol is associated with the third and final drug in the series, potassium chloride.

84.    There is no medical dispute that the injection of potassium chloride into an individual who has not been adequately anesthetized will cause excruciating pain.

85.    Potassium chloride induces an intense burning sensation throughout the blood vessel walls running through a prisoner's body. If a prisoner is not fully anesthetized prior to the injection of potassium chloride, then he will consciously experience the agony of cardiac arrest.

86.    The third risk involves the use of midazolam as the first drug in the series. Midazolam is not in the barbiturate class of drugs, and has never been used by any jurisdiction in a single-drug execution protocol, unlike sodium thiopental and pentobarbital.  Benzodiazepines are not pharmacologically equivalent to barbiturates.

87.    Midazolam is classified as a benzodiazepine, a class of drugs including Valium and Xanax that are commonly used in the treatment of anxiety and panic disorders.

88.    Midazolam is incapable of inducing a "deep, comalike unconsciousness." Midazolam acts to depress the activity of the central nervous system ("CNS"), but the depth of that depression is limited, and even a large dose of midazolam will not result in unconsciousness or general anesthesia.

89.    Both benzodiazepines and barbiturates act upon the same type of receptor complex in the brain, the GABA receptor-chloride ion channel complex ("GABA receptor"). When the GABA receptor is acted upon, chloride ion channels open. The influx of chloride ions from the outside of the neuron to the inside causes a decrease in electrical activity of the neuron, neuronal inhibition, and ultimately CNS depression.

90.    However, benzodiazepines and barbiturates exhibit different mechanisms of action upon the receptor complex. These different mechanisms significantly impact the form and extent of the effect of these two drug classes on the GABA receptor.

91.    Benzodiazepines (such as midazolam) require the presence of GABA, an inhibitory neurotransmitter in the brain, to exhibit any effect on the GABA receptor. GABA is a limited resource as it is made and released by inhibitory neurons, which are finite in number. GABA must be released and must act upon the GABA receptor at the same time as the benzodiazepine for drugs like midazolam to produce an inhibitory neuronal effect. Further, the presence of a benzodiazepine only increases the frequency at which the GABA receptor complex opens, not the duration of that opening. As a result of their mechanism of action, benzodiazepines can only produce a partial pharmacological effect.

92.    In contrast, barbiturates do not require the presence of GABA to act upon the GABA receptor. Barbiturates can cause neuronal inhibition even when GABA is not present. Further, unlike benzodiazepines, barbiturates increase the duration of opening at the GABA receptor such that activity of the neuron is completely shut down, resulting in electrical silence.

93.    Midazolam has a ceiling effect that is not present in barbiturates. The ceiling effect refers to a limit on the magnitude of the produced effect of a drug as the dose is increased. Midazolam's ceiling effect is a direct result of the mechanism of action described above, and explains why benzodiazepines are incapable of rendering a person unconscious and insensate to pain.

94.    Injection of an IV bolus of 500 milligrams of midazolam, as called for by the 2025 Execution Protocol, would produce a brain concentration many times higher than the concentration at which the ceiling effect is observed.

95.     However, increasing the dose of midazolam above the amount necessary to reach the ceiling effect will have no additional effect on the neurons.

96.     Thus, even at concentrations of midazolam at or above the concentration at which the ceiling effect is observed, the drug cannot be relied upon to render a person anesthetized and insensate to pain.

97.     Where there is a substantial risk that the first drug injected in a three-drug series is not chemically capable of rendering the prisoner unconscious and insensate so he does not feel the painful effects of the second and third drugs, the execution will cause severe, torturous pain for the prisoner, in violation of the Eighth and Fourteenth Amendments.

98.     The three risks set forth above create a substantial risk of severe pain and serious harm.

99.     There is no penological justification for the use of a paralytic agent and potassium chloride in an execution by lethal injection. Executions may be carried out through the use of a single-drug anesthetic-only injection, a protocol now used in most executions nationwide which, in the words of the Supreme Court, "is widely conceded to be able to render a person fully insensate and does not carry the risks of pain that some have associated with other lethal injection protocols."[1]

100.    An execution conducted by Defendants which continues to use a three-drug protocol, thereby refusing to adopt the feasible and readily implemented alternative of a single-drug protocol (which significantly reduces the substantial risks of severe pain and serious harm posed by the use of a chemical paralytic agent and potassium chloride), violates the Eighth Amendment.

---

[1] *Barr v. Lee*, 591 U.S. 979, 980 (2020) (citations and internal quotations omitted).

101.    Thus, Defendants' planned use of midazolam as the first drug in a three-drug series, which is completed with the intravenous administration of a chemical paralytic agent and potassium chloride, creates a substantial risk of serious harm and severe pain to Plaintiffs.

102.    There is a feasible alternative which could substantially reduce the risk of severe pain and serious harm presented by the continuous intravenous administration of midazolam in combination with a chemical paralytic agent and potassium chloride.

103.    The use of a lethal dose of a barbiturate, manufactured under FDA approval, is a feasible and available alternative which would significantly reduce the substantial risk of severe pain presented by Mississippi's current procedure. Other jurisdictions have already moved towards the use of a single-drug anesthetic-only protocol.

104.    In the absence of a supply of a barbiturate in manufactured form, injection of a barbiturate compounded by a duly licensed compounding pharmacy, tested for integrity, purity, and potency by a laboratory unaffiliated with a compounding pharmacy or a department of corrections, and used in a single-drug anesthetic-only protocol (without a paralytic agent or potassium chloride), is a feasible and available alternative which would significantly reduce the substantial risk of severe pain presented by Mississippi's current procedure.

**G.    MDOC currently has no protocol to govern the other methods of execution authorized by the Amended Statute, i.e., nitrogen hypoxia, electrocution, or the firing squad.**

105.    From 1817 when Mississippi was first admitted to the Union until October 11, 1940, Mississippi executed prisoners sentenced to death by hanging.

106.    From October 11, 1940 through February 5, 1952, Mississippi executed death-sentenced prisoners with the electric chair.

19

107.    From March 3, 1955 through June 21, 1989, Mississippi executed death-sentenced prisoners in the gas chamber.

108.    Mississippi has never executed a condemned prisoner by the use of "nitrogen hypoxia," one of the methods of execution authorized by the Amended Statute.

109.    Defendants have not promulgated any protocol to govern an execution performed by the use of "nitrogen hypoxia."

110.    Since the effective date of the Amended Statute on July 1, 2022, Defendants have not promulgated any protocol to govern an execution performed by electrocution.

111.    Mississippi has never executed a death-sentenced prisoner by the firing squad.

112.    Since the effective date of the Amended Statute on July 1, 2022, Defendants have not promulgated any protocol to govern an execution performed by the firing squad.

**H.    The use of nitrogen hypoxia in Mississippi executions presents substantial risks of severe pain to the Named Plaintiffs and Putative Class Plaintiffs.**

113.    Nitrogen hypoxia is a method of execution that forces nitrogen gas inhalation, depriving the condemned prisoner of oxygen and causing asphyxiation.

114.    Execution by nitrogen gas creates terror and extreme pain and suffering, depriving the condemned prisoner of oxygen, which can cause significant pain and suffering, including the agony of conscious suffocation.

115.    For example, to test the accuracy of pulse oximeters, researchers have conducted controlled laboratory desaturation studies using healthy volunteers. In these studies, at blood oxygen saturation levels of 60% to 100%, "symptoms range from minimal or mild shortness of breath and visual changes to a full-blown feeling of suffocation"; at blood oxygen saturations of less than 60%, the "majority of people, not yet unconscious, report significant distress and shortness of breath."  Because of this response, "it is [now] unethical to even study the effects of

20

very low oxygen levels (<60%) on humans. . . . [Put differently, researchers] have stopped using desaturations below 60% due to concerns for study participant safety and comfort."

116.    Indeed, the American Veterinary Medical Association ("AVMA") has advised the use of nitrogen gas is "unacceptable" as euthanasia for most mammals, because it "create[s] an anoxic environment that is distressing for some species and aversive to [others]."

117.    The deprivation of oxygen can also cause nausea.  Because the condemned prisoner is strapped to a gurney in the supine position, vomiting can cause them to choke to death.

118.    Moreover, if the respirator mask is not properly sealed, some oxygen can enter the mask and therefore prolong the time to reach unconsciousness and lead the condemned prisoner to enter a persistent vegetative state, have a stroke, or endure the painful sensation of suffocation.

119.    On January 25, 2024, Kenneth Smith was the first person in the United States to be executed by nitrogen hypoxia.

120.    According to witness accounts, when the flow of nitrogen gas began, Mr. Smith began violently seizing. His legs locked together (with no bend at the knee) and flew up and down, repeatedly slamming down forcefully on the gurney. Mr. Smith's head convulsed on and off the gurney. Mr. Smith was breathing heavily and gasping. This process went on for several minutes.

121.    One of the execution witnesses wrote that after initiation of the flow of nitrogen gas, Mr. Smith started "to convulse and shake vigorously for about four minutes. . . .  It was another two to three minutes before he appeared to lose consciousness, all while gasping for air to the extent that the gurney shook several times."

122.    Twenty-seven minutes elapsed between the initiation of the flow of nitrogen gas and Mr. Smith's death.

123.    Mr. Smith's autopsy results establish that he suffered from negative pressure pulmonary edema (NPPE), which occurs when a person attempts to breathe while the upper airway is obstructed, causing fluid to be drawn from blood vessels into the alveoli.

124.    An individual experiencing panic and the sensation of the inability to breathe while also being denied oxygen will experience a constricted airway like an upper airway obstruction. This creates the NPPE observed in Mr. Smith's autopsy findings.

125.    On November 21, 2024, Carey Grayson was executed with nitrogen gas in Alabama.  During the approximately six minutes it took for Mr. Grayson to lose consciousness, he "tightly clenched his hands, took deep gasps, shook his head vigorously and pulled against his restraints."

126.    Demetrius Frazier was executed by nitrogen gas in Alabama on February 6, 2025. The execution took approximately 20 minutes.  During that time, Mr. Frazier "started waving his hands in circles toward his body." Then, he "clenched his face and his nostrils flared, while his hands quivered.  His legs slightly lifted up off the gurney and he gasped." After that, Mr. Frazier "had sporadic gasping and shallow breathing."

127.    Without a fully researched and developed protocol, Defendants in this case have not determined such factors as whether to use medical-grade or industrial-grade nitrogen gas, whether the condemned prisoner's mask would be "one-size-fits-all" or sized to the prisoner's head and mouth, whether to anesthetize the prisoner prior to the opening of the nitrogen gas flow, and multiple other significant issues.

128.    Moreover, on information and belief, Defendants State Executioner and Unknown Executioners are not qualified to administer nitrogen hypoxia and have not been trained to administer nitrogen hypoxia.

129.    There is a feasible alternative which could substantially reduce the risk of severe pain, agony, and serious harm presented by the use of nitrogen hypoxia in executions in Mississippi.

130.    The use of a lethal dose of a barbiturate, manufactured under FDA approval, is a feasible and available alternative which would significantly reduce the substantial risk of severe pain presented by nitrogen hypoxia.

131.    In the absence of a supply of a barbiturate in manufactured form, injection of a barbiturate compounded by a duly licensed compounding pharmacy, tested for integrity, purity, and potency by a laboratory unaffiliated with a compounding pharmacy or a department of corrections, and used in a single-drug anesthetic-only protocol (without a paralytic agent or potassium chloride), is a feasible and available alternative which would significantly reduce the substantial risk of severe pain presented by the use of nitrogen hypoxia in executions.

132.    The use of nitrogen hypoxia in Mississippi executions presents a risk of severe pain and serious harm to Plaintiffs which is substantial in comparison to the use of the one-drug pentobarbital protocol.

I.    **The use of electrocution in Mississippi executions presents substantial risks of severe pain to the Named Plaintiffs and Putative Class Plaintiffs.**

133.    Mississippi has not executed a death-sentenced prisoner by electrocution since 1952. According to medical literature, the jolt of six to twelve amps at 2000-3000 volts lasts a few seconds. The current surges and is then turned off, at which the body is seen to relax. The doctors wait a few seconds for the body to cool down and then check the heart. If it is still

beating, another jolt is applied. The prisoner's hands grip the chair and there is violent movement of the limbs which may result in dislocations or fractures. The tissues swell. Micturition and defecation occur. Steam or smoke rises and there is a smell of burning.

134.    Several seconds or minutes could elapse during which the condemned person could be conscious. Death from electrocution could be due to asphyxia caused by paralysis of respiration and to ventricular fibrillation. If so, the conscious pain and agony would be similar to that caused by the chemical paralytic in the three-drug protocol or that by nitrogen hypoxia. Alternatively, the condemned prisoner dies of heat denaturation of the respiratory center in the medulla.

135.    Death in the electric chair is torturous. Electrocution produces various physiological reactions: burning and charring of the skin; thermal heating, i.e., cooking of the body and internal organs; direct excitation of sensory, motor, secretory, and autonomic nerves; direct excitation of brain nerves, causing sensations of sound, light, dread, and fear; simultaneous contractions in the flexor and extensor muscles (e.g., the hamstring muscle on the back of the thigh and the quadriceps muscle on the front of the thigh at the same time); and contraction of the muscles necessary for breathing, preventing the person from inhaling or exhaling and causing the person to suffocate. All of these reactions cause extreme pain.

136.    A person executed by electrocution will remain conscious and sensate during an electrocution until they lose consciousness. Electrocution causes loss of consciousness by terminating brain functioning, which occurs through either: (1) a direct electrical stimulation of the neurons in the brain; or (2) insufficient blood circulation to the brain due to cardiac asystole, shock entrainment, fibrillation, or asphyxia due to either cardiac or respiratory arrest. Both processes take time. Accordingly, a person subjected to death by electrocution will remain

conscious and sensate. Because a person subjected death in the electric chair can remain alive, conscious, and sensate during the electrocution, there is a significant likelihood of excruciating pain during the event.

137.    Death in the electric chair also produces needless and wanton psychological suffering. During the electrocution process, the condemned person's perception of time may become distorted, causing them to experience the electrical trauma as lasting dramatically longer than it appears to a bystander and causing him to perceive each of the sixty cycles of electrical current that will pass through his body every second. When an electrical current directly excites brain nerves, it can trigger sensations of sound, light, dread, and fear.

138.    Many factors associated with electrocution, such as severe burning, boiling body fluids, asphyxiation, and cardiac arrest, can cause extreme pain when unconsciousness is not instantaneous.

139.    The effects of electrocution on the human body include the following: charring of the skin and severe external burning, such as the possible burning away of the ear; exploding of the penis; defecation and micturition, which necessitate that the condemned person wear a diaper; drooling and vomiting; blood flowing from facial orifices; intense muscle spasms and contractions; odors resulting from the burning of the skin and the body; and extensive sweating and swelling of skin tissue.

140.    The jurisdictions which continued to use the electric chair through the last decade of the twentieth century inflicted unspeakable pain and terror on the prisoners forced to die by electrocution.

141. In the May 4, 1990 execution of Jesse Tafero in Florida, the executioner applied three 2,000-volt jolts of electricity, causing flames to shoot from Mr. Tafero's head. The medical examiner could not determine whether he survived the first two jolts.

142. Gregory Resnover was executed by electrocution in Indiana on December 8, 1994. When the electricity was applied, Resnover rose suddenly "from his chair in a giant spasm." His head jerked back, and "smoke and spark-like flames came out of the top of his head."

143. Larry Lonchar moaned and seemed to gasp for air as the executioner applied two jolts of 2,000 volts each to execute him in Georgia on November 14, 1996.

144. During Florida's execution of Pedro Medina on March 25, 1997, "blue and orange flames up to a foot long shot from the right side of his head and flickered for six to ten seconds, filling the execution chamber with smoke."

145. On July 8, 1999, Florida executed Allen Davis by electrocution. After being jolted with 2,300 volts, blood poured from his face, and soaked a large portion of his shirt. Testimony indicated that the strap placed across Davis's mouth hindered his breathing and partially asphyxiated him prior to and during the electrocution.

146. On information and belief, Defendants State Executioner and Unknown Executioners are not qualified to execute condemned prisoners by electrocution and have not been trained in this method.

147. There is a feasible alternative which could substantially reduce the risk of severe pain, agony, and serious harm presented by the use of electrocution in executions in Mississippi.

148.    The use of a lethal dose of a barbiturate, manufactured under FDA approval, is a feasible and available alternative which would significantly reduce the substantial risk of severe pain presented by electrocution.

149.    In the absence of a supply of a barbiturate in manufactured form, injection of a barbiturate compounded by a duly licensed compounding pharmacy, tested for integrity, purity, and potency by a laboratory unaffiliated with a compounding pharmacy or a department of corrections, and used in a single-drug anesthetic-only protocol (without a paralytic agent or potassium chloride), is a feasible and available alternative which would significantly reduce the substantial risk of severe pain presented by the use of electrocution as a method of execution.

150.    The use of electrocution in Mississippi executions presents a risk of severe pain and serious harm to Plaintiffs which is substantial in comparison to the use of the one-drug pentobarbital protocol.

**J.    The use of the firing squad in Mississippi executions presents substantial risks of severe pain to the Named Plaintiffs and Putative Class Plaintiffs.**

151.    The state of Mississippi has never executed condemned prisoners by firing squad. On information and belief, Defendants State Executioner and Unknown Executioners are not qualified to execute condemned prisoners by firing squad and have not been trained in this method.

152.    Execution by firing squad is typically conducted by multiple people simultaneously firing rifles at a target approximately overlying the heart of the prisoner, inflicting multiple, concurrent rifle wounds to the heart and surrounding structures, and causing severe disruption and destruction of bodily tissues. The multiple rifle wounds to the chest will cause extensive damage to the skin and chest wall soft tissues and multiple fractures of the ribs and sternum, which would be extremely painful.

153.    The mechanism of death by firing squad is disruption of the heart, resulting in cessation of circulation of blood to the vital organs. But even this abrupt cessation of circulation does not cause immediate unconsciousness. Even if all bullets hit the intended target and effectively destroy the heart, there is enough blood left in the brain for the individual to survive for 10 to 15 seconds and be conscious and able to feel pain. During that period, the prisoner would suffer "excruciating pain" from the massive trauma to his bones and tissue caused by the executioners' bullets.

154.    On April 11, 2025, Mikal Mahdi was executed by firing squad in South Carolina. According to media reports, Mr. Mahdi cried out as the bullets hit him, and his arms flexed. A white target with the red bull's-eye over his heart was pushed into the wound in his chest. Mahdi groaned two more times about 45 seconds after that. His breaths continued for about 80 seconds before he appeared to take one final gasp.

155.    An autopsy authorized by Mr. Mahdi and his next of kin found only two entrance wounds on Mr. Mahdi's chest, despite the fact that three prison officials were on the firing squad. The two wounds were low on Mr. Mahdi's torso just above the border of the abdomen. The autopsy also determined that there were two distinct wound paths, traveling "downward and to the right" inside Mr. Mahdi's torso, "macerat[ing] the left lobe of the liver and the pancreas" and "the left lower lung lobe" before crashing into his spine and ribs." Bullet fragments made "two perforations of the right ventricle of [Mr. Mahdi's] heart, comprising two holes in the front, and two holes in the back," leaving it otherwise intact.

156.    Mr. Mahdi's expert pathologist states that Mr. Mahdi's "ventricles were not disrupted, so he did continue to have some (albeit compromised) circulation after he was shot, permitting him to remain conscious for more than 15 seconds" and as long as 60. The pathologist

also noted the press observers' descriptions of Mr. Mahdi's series of vocalizations—first when he was shot, then 45 seconds later, and then again about a minute and a quarter after the shots— and concluded that "Mr. Mahdi's groaning at about 45 seconds after he was shot is consistent with representing his waning moments of consciousness."

157.    There is a feasible alternative which could substantially reduce the risk of severe pain, agony, and serious harm presented by the use of the firing squad in executions in Mississippi.

158.    The use of a lethal dose of a barbiturate, manufactured under FDA approval, is a feasible and available alternative which would significantly reduce the substantial risk of severe pain presented by the firing squad.

159.    In the absence of a supply of a barbiturate in manufactured form, injection of a barbiturate compounded by a duly licensed compounding pharmacy, tested for integrity, purity, and potency by a laboratory unaffiliated with a compounding pharmacy or a department of corrections, and used in a single-drug anesthetic-only protocol (without a paralytic agent or potassium chloride), is a feasible and available alternative which would significantly reduce the substantial risk of severe pain presented by the use of the firing squad as a method of execution.

160.    The use of the firing squad in Mississippi executions presents a risk of severe pain and serious harm to Plaintiffs which is substantial in comparison to the use of the one-drug pentobarbital protocol.

## V.    CLASS ACTION ALLEGATIONS

161.    Named Plaintiffs bring this action, on behalf of themselves and all others similarly situated, for the purpose of asserting the claims alleged in this Complaint on a common basis under Federal Rule of Civil Procedure 23(b)(2).

162.    A class action is a superior means, and the only practicable means, by which the Named Plaintiffs and Putative Class Plaintiffs can challenge the violation of their rights under the Eighth and Fourteenth Amendments.

163.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a).

164.    Named Plaintiffs propose the following class seeking declaratory and injunctive relief: all persons who are now, or who may be in the future, held in the custody of MDOC under sentence of death, and who are not currently plaintiffs in <u>Jordan, et al., v. Cain, et al.</u>, No. 3:15-cv-295-HTW-LGI in the United States District Court for the Southern District of Mississippi.

165.    The claims in this Complaint meet the numerosity requirement of Fed. R. Civ. P. 23(a)(1). According to MDOC's website, there are currently 36 individuals in MDOC custody under sentence of death. In addition to these individuals, there is an indeterminate future stream of class members who will suffer the same injury, absent injunctive relief, as additional persons charged with murder are convicted and sentenced to death. Thus, traditional joinder is not practicable.

166.    The claims in this Complaint meet the commonality requirement of Fed. R. Civ. P. 23(a)(2). Common questions of law and fact exist as to all members of the Class.  The Named Plaintiffs and the Putative Class Plaintiffs seek common declaratory and injunctive relief, including a determination as to whether the Amended Statute, on its face, violates the Eighth and Fourteenth Amendments; whether Defendants' execution protocol and execution practices violate the Eighth and Fourteenth Amendments; whether an execution using nitrogen hypoxia, electrocution, and/or the firing squad without a protocol violates the and whether the notice provision of the Amended Statute, as applied, violates the Fourteenth Amendment.

30

167.    The common legal and factual questions arise from the Amended Statute, the 2025 Execution Protocol, and Defendants' execution practices.

168.    Among the most important, but not the only, common fact questions are:

   a.    Whether the Amended Statute gives unlimited discretion to the MDOC Commissioner and Deputy Commissioners to select a method of execution from the menu authorized by the Amended Statute;

   b.    Whether the Deputy Commissioners, who serve at the will and pleasure of the Commissioner, provide any effective check on the discretion given the Commissioner under the Amended Statute;

   c.    Whether the Commissioner and the Deputy Commissioners equally participated in the decision to execute Thomas Loden in December 2022 by a three-drug lethal injection series consisting of midazolam, vecuronium bromide, and potassium chloride;

   d.    Whether Defendants established and followed any process to decide to execute Thomas Loden in December 2022 by a three-drug lethal injection series consisting of midazolam, vecuronium bromide, and potassium chloride;

   e.    Whether Defendants established and followed any criteria to execute Thomas Loden in December 2022 by a three-drug lethal injection series consisting of midazolam, vecuronium bromide, and potassium chloride;

   f.    Whether the notice of manner of execution provided to Thomas Loden pursuant to § 99-19-51(1) set forth the specific substances which would be injected into his body;

31

g.  Whether the Commissioner and the Deputy Commissioners equally participated in the decision to execute Richard Jordan in June 2025 by a three-drug lethal injection series consisting of midazolam, rocuronium bromide, and potassium chloride;

h.  Whether Defendants established and followed any process to decide to execute Richard Jordan in June 2025 by a three-drug lethal injection series consisting of midazolam, rocuronium bromide, and potassium chloride;

i.  Whether Defendants established and followed any criteria to decide to execute Richard Jordan in June 2025 by a three-drug lethal injection series consisting of midazolam, rocuronium bromide, and potassium chloride;

j.  Whether the notice of manner of execution provided to Richard Jordan pursuant to § 99-19-51(1) set forth the specific substances which would be injected into his body;

k.  Whether the injection of a chemical paralytic in a person who is not unconscious and insensate to pain causes them to suffocate while experiencing an intense, conscious, and desperate desire to breathe.

l.  Whether the intravenous injection of concentrated potassium chloride solution in a person who is not unconscious and insensate to pain causes excruciating pain similar to intravenous burning;

m.  Whether midazolam, at any dosage, can produce general anesthesia;

n.  Whether midazolam has a ceiling effect, a dosage above which additional does of the drug will not have any greater effect;

32

o.  Whether, in the executions of David Cox in November 2021, Thomas Loden in December 2022, and/or Richard Jordan in June 2025, Defendants State Executioner and/or Unknown Executioners conducted a consciousness check between the administration of midazolam and that of the chemical paralytic that was compliant with necessary and medically appropriate and approved methods;

p.  Whether, in the executions of David Cox in November 2021, Thomas Loden in December 2022, and/or Richard Jordan in June 2025, Defendants State Executioner and/or Unknown Executioners conducted an examination of the condemned prisoner sufficient to adequately confirm that the IV line remained affixed and was functioning properly;

q.  What substances can be injected intravenously in a lethal quantity into a person's body;

r.  Whether, since August 1, 2021, Defendants have made any attempts to obtain pentobarbital, in manufactured or compounded form, for use in lethal injection executions;

s.  Whether pentobarbital, in manufactured or compounded form, has been used by jurisdictions other than Mississippi to execute condemned prisoners in a one-drug protocol;

t.  Whether pentobarbital, in manufactured or compounded form, is available for Defendants to use in lethal injection executions;

u.  Whether Defendants have drafted or promulgated a protocol for the execution of condemned prisoners by nitrogen hypoxia;

33

v.   Whether Defendants have obtained any equipment or substances for use in nitrogen hypoxia executions;

w.   Whether Defendant State Executioner and Unknown Executioners are qualified, and have been trained, in how to conduct nitrogen hypoxia executions;

x.   Whether Defendants have drafted or promulgated a protocol for the execution of condemned prisoners by electrocution;

y.   Whether Defendants have obtained any equipment or substances for use in executions by electrocution;

z.   Whether Defendant State Executioner and Unknown Executioners are qualified, and have been trained, in how to conduct executions by electrocution;

aa.  Whether Defendants have drafted or promulgated a protocol for the execution of condemned prisoners by the firing squad;

bb.  Whether Defendants have obtained any equipment or substances for use in executions by firing squad; and

cc.  Whether Defendant State Executioner and Unknown Executioners are qualified, and have been trained, in how to conduct executions by firing squad;

169.  Among the most important, but not the only, common questions of law are:

a.   Whether the boundless discretion given to the Commissioner and the two Deputy Commissioners to choose the method of execution in any particular case violates the Eighth and Fourteenth Amendments;

34

b.  Whether, in light of the fact that the Deputy Commissioners serve at the will and pleasure of the Commissioner, the Amended Statute gives the Commissioner sole discretion to choose the method of execution in any particular case, and if so, whether this violates the Eighth and Fourteenth Amendments;

c.  Whether the Amended Statute's authorization of execution by "intravenous injection of a substance or substances in a lethal quantity into the body" is facially invalid under the Eighth Amendment;

d.  Whether the notice provisions of § 99-19-51(1) are sufficient to provide a condemned prisoner the opportunity to challenge the constitutionality of the method by which they are to be executed;

e.  Whether the administration of a chemical paralytic and potassium chloride, in a three-drug lethal injection protocol beginning with the administration of midazolam, presents a risk of severe pain and serious harm in comparison to the administration of a lethal dose of a barbiturate in a one-drug lethal injection protocol;

f.  Whether the use of "nitrogen hypoxia" in executions presents a risk of severe pain and serious harm in comparison to the administration of a lethal dose of a barbiturate in a one-drug lethal injection protocol;

g.  Whether the use of electrocution in executions presents a risk of severe pain and serious harm in comparison to the administration of a lethal dose of a barbiturate in a one-drug lethal injection protocol;

h. Whether the use of the firing squad in executions presents a risk of severe pain and serious harm in comparison to the administration of a lethal dose of a barbiturate in a one-drug lethal injection protocol; and

i. Whether the notice provisions of the Amended Statute fail to provide sufficient opportunity for a condemned prisoner to seek judicial relief against an unconstitutional method of execution and thereby violates the Due Process Clause of the Fourteenth Amendment.

170.    The Named Plaintiffs' claims are typical of the claims of the Putative Class Plaintiffs, and they have the same interests in this case as all other members of the putative Class.  Each of them suffers injuries from the Defendants' current and threatened violation of their rights to be free from cruel and unusual punishment as guaranteed by the Eighth and Fourteenth Amendments. The answer to whether the Amended Statute and/or Defendants' policies and practices are unconstitutional will determine the claims of the Named Plaintiffs and each of the Putative Class Plaintiffs.

171.    The Named Plaintiffs and the Putative Class Plaintiffs seek the same declaratory and injunctive relief.  If the Named Plaintiffs succeed in their claims that the Amended Statute and/or Defendants' policies and practices violate their constitutional rights, that ruling will benefit every other member of the Class.

172.    The Named Plaintiffs' claims therefore meet the typicality requirement of Fed. R. Civ. P. 23(a)(3).

173.    The Named Plaintiffs meet the adequacy requirement of Fed. R. Civ. P. 23(a)(4). The Named Plaintiffs are adequate representatives of the Class because their interests in the vindication of the legal claims they raise are entirely aligned with the interests of the other Class

members, who each have the same basic constitutional claims. The Named Plaintiffs are members of the putative Class, and their interests coincide with and do not conflict with those of the other Class members.

174.     There are no known conflicts of interest among members of the putative Class, all of whom have a similar interest in vindicating their constitutional rights in the face of Defendants' unlawful policies and procedures.

175.     Plaintiffs are represented by James Craig, Emily Washington, and Jack Stephens, who are attorneys from the Roderick and Solange MacArthur Justice Center in New Orleans ("the RSMJC Attorneys"). The RSMJC Attorneys have experience litigating complex civil rights matters in federal court, including method-of-execution challenges brought under § 1983. and knowledge of both the details of the Defendants' policies and practices and the relevant constitutional and statutory law.

176.     As a result, counsel have undertaken significant efforts toward becoming intimately familiar with the Amended Statute, Defendants' protocols, policies, practices, customs, and usages which implement that enactment, and with all of the relevant and controlling state and federal laws and procedures. The interests of the members of the Class will be fairly and adequately protected by the Named Plaintiffs and their attorneys.

177.     Class action status is appropriate under Fed. R. Civ. P. 23(b)(2) because the Amended Statute, and Defendants' protocols, policies, practices, customs, and usages which implement that enactment, act and have acted in the same unconstitutional manner with respect to all Class members.

178.    The Class seeks declaratory relief, requesting that this Court find that the Amended Statute and Defendants' protocols, policies, practices, customs, and usages which implement that enactment violate their rights under the Eighth, and Fourteenth Amendments.

179.    The Class also seeks injunctive relief to remedy the constitutional violations, including requiring Defendants to use a one-drug lethal injection protocol, employing a fatal dose a barbiturate, rather than the unconstitutional methods proposed in the Amended Statute and through the Defendants' protocols, policies, practices, customs, and usages which implement that enactment.

180.    Because the putative Class challenges Defendants' scheme as unconstitutional and seeks declaratory and injunctive relief that would apply the same relief to every member of the Class, Rule 23(b)(2) certification is appropriate and necessary.

## VI.    CLAIMS FOR RELIEF

### A.    Count One: The Amended Statute, together with the 2025 Execution Protocol and Defendants' execution practices, violate the rights of the Named Plaintiffs and the Putative Class Plaintiffs to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

181.    The Eighth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, prohibits the infliction of superadded pain in the execution of a death sentence.

182.    Because it is nearly impossible to determine with certainty whether a prisoner will suffer serious and needless pain and suffering during an execution, the question of whether a particular execution procedure will inflict such pain and suffering involves an inquiry as to whether the prisoner is subject to a substantial or intolerable risk of severe pain.

183.    Under the Eighth Amendment, a prisoner must show a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of

severe pain and that the State has refused to adopt without a legitimate penological reason. Further, the determination whether the risk of pain associated with the State's method is "substantial" is based on that method's comparison to a known and available alternative.

184.    To decide whether the State has cruelly "superadded" pain to the punishment of death cannot be accomplished by examining the State's proposed method in a vacuum, but only by comparing that method with a viable alternative.

185.    Such a substantial or intolerable risk of serious harm may occur when a state lacks a clear protocol for lethal injection, when experience with the procedure demonstrates that there are foreseeable problems, or when it is known that the drugs intended for use in lethal injections will very likely result in the prisoner suffering intense pain that an alternative procedure would not cause.

186.    The Amended Statute authorizes Defendants Cain, Garner, and Hunt to execute Plaintiffs with "intravenous injection of a substance or substances in a lethal quantity into the body" of the condemned.

187.    The wide-ranging language "injection of a substance or substances in a lethal quantity" is unlimited. It does not even limit Defendants Cain, Garner, and Hunt to pharmaceutical products. Rather, the Defendants could select execution by IV administration of many household products (e.g. bleach) and various poisons like cyanide, arsenic, and mercury.

188.    Further, the Amended Statute struck the language in the previous statute which required use of a first drug that "is likely to render the condemned inmate unconscious, so that the execution process should not entail a substantial risk of severe pain."

189.    Because the Amended Statute grants wide discretion to Defendants Cain, Garner, and Hunt in the selection of lethal injection substances, that statute, on its face, violates the Eighth Amendment.

190.    The Amended Statute is applied currently by Defendants through the 2025 Execution Protocol. As detailed in Section IV.F. above, that protocol's use of midazolam as the first drug in a three-drug series, completed with the intravenous administration of a chemical paralytic agent and potassium chloride, creates a substantial risk of serious harm and severe pain to Plaintiffs.

191.    As detailed in Section IV.C. above, the failure of Defendants to adopt safeguards which have been implemented in the few other jurisdictions which continue to use the three-drug protocol also creates a substantial risk of serious harm and severe pain to Plaintiffs.

192.    And as detailed in Section IV.D. above, Defendants' execution practices forego even the safeguards which they purport to have implemented: the consciousness check and the IV Line check.

193.    There is a feasible alternative which could substantially reduce the risk of severe pain and serious harm presented by the continuous intravenous administration of midazolam in combination with a chemical paralytic agent and potassium chloride.

194.    The use of a lethal dose of a barbiturate, manufactured under FDA approval, is a feasible and available alternative which would significantly reduce the substantial risk of severe pain presented by Mississippi's current procedure. Other jurisdictions have already moved towards the use of a single-drug anesthetic-only protocol.

195.    In the absence of a supply of a barbiturate in manufactured form, injection of a barbiturate compounded by a duly licensed compounding pharmacy, tested for integrity, purity,

and potency by a laboratory unaffiliated with a compounding pharmacy or a department of corrections, and used in a single-drug anesthetic-only protocol (without a paralytic agent or potassium chloride), is a feasible and available alternative which would significantly reduce the substantial risk of severe pain presented by Mississippi's current procedure.

196.    Defendants' refusal to adopt these alternatives for the executions of Plaintiffs, in the face of these documented advantages, without a legitimate penological justification for adhering to its current method of execution, constitutes cruel and unusual punishment prohibited by the Eighth Amendment.

197.    For the reasons set forth above, Defendants are deliberately indifferent to Plaintiffs' constitutional rights.

198.    This Court has the jurisdiction and authority to enter a declaratory judgment, and a preliminary and permanent injunction to prevent the violations of the Eighth and Fourteenth Amendments alleged in this Count.

**B.    Count Two: Defendants' continued use of a three-drug protocol in the face of evolving standards of decency which require abandonment of the use of a chemical paralytic agent and potassium chloride violates the rights of Named Plaintiffs and Putative Class Plaintiffs to be free from cruel and unusual punishment guaranteed by Eighth and Fourteenth Amendments to the United States Constitution.**

199.    "The basic concept underlying the Eighth Amendment is nothing less than the dignity of man . . . . The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Atkins v. Virginia*, 536 U.S. 304, 311-312 (2002) (quoting *Trop v. Dulles*, 356 U.S. 86 (1958)). The Supreme Court has repeatedly looked to legislation enacted by the states as the "clearest and most reliable objective evidence of contemporary values," *id*. at 312 (*quoting Penry v. Lynaugh*, 492 U.S. 302, 331 (1989)), relying

41

on such legislative evidence of evolving trends to narrow the classes of those individuals we seek

to punish through the death penalty and to determine the suitability of those methods and

protocols by which we carry out such sentences.

200.    Mississippi's decision to continue use of a three-drug lethal injection protocol

runs contrary to the trend towards single-drug anesthetic-only protocols employed successfully

by other states in recent years. The chart below summarizes this evolving trend; the execution

protocols and drugs listed below track the lethal injection statutes propagated by state

legislatures, as well as the lethal injection protocols propagated and implemented by state

departments of corrections, from January 1, 2015 to June 4, 2025.

|  | 3-drug Pentobarbital | 1-drug Pentobarbital | 3-drug Midazolam | Other | Total |
|---|---|---|---|---|---|
| 2015 | 1 <br> VA | 24 <br> GA (5), TX (13), MO (6) | 3 <br> FL (2), OK (1) |  | 28 |
| 2016 |  | 17 <br> TX (7), GA (9), MO (1) | 3 <br> FL (1), AL (2) |  | 20 |
| 2017 |  | 9 <br> TX (7), MO (1), GA (1) | 11 <br> VA (2), AR (4), AL (3), OH (2) | 3 (FL) | 23 |
| 2018 |  | 16 <br> TX (13), GA (2), SD (1) | 4 <br> AL (2), TN (1), OH (1) | 5 <br> FL (2), NE (1), TN (2) | 25 |
| 2019 |  | 14 <br> TX (9), GA (3), MO (1), SD (1) | 4 <br> AL (3), TN (1) | 4 <br> FL (2), TN (2) | 22 |
| 2020 |  | 15 <br> USA (10), TX (3), GA (1), MO (1) | 1 <br> AL (1) | 1 <br> TN (1) | 17 |
| 2021 |  | 7 <br> USA (3), TX (3), MO (1) | 4 <br> AL (1), MS (1), OK (2) |  | 11 |
| 2022 |  | 10 <br> TX (5), MO (2), AZ (3) | 8 <br> OK (5), AL (2), MS (1) |  | 18 |
| 2023 |  | 12 <br> TX (8), MO (4) | 6 <br> OK (4), AL (2) | 6 <br> FL (6) | 24 |
| 2024 |  | 14 <br> TX (5), MO (4), GA (1), UT (1), SC (2), IN (1) | 7 <br> AL (3), OK (4) | 4 <br> AL (3) (gas), FL (1) | 25 |
| 2025 |  | 8 <br> SC (1), TX (4), AZ (1), IN (1), TN (1) | 2 <br> OK (1), AL (1) | 9 <br> SC (2) (firing), AL (1) (gas), LA (1) (gas), FL (5) | 19 <br> (to date) |
| TOTAL | 1 (< 1%) | 146 (63%) | 53 (23%) | 32 (14%) | 232 |

201.    The trend towards abandonment of the three-drug protocol is evidence of the evolving standards of decency which inform the Eighth Amendment. From 2010 to 2012, of the 132 executions conducted nationwide, over 70 percent (94 executions) were conducted using a three-drug protocol. Yet since 2013, just three states have conducted executions using a three-drug protocol, a total of 27 executions (29 percent) of the 94 conducted nationwide. Only 14 of these 94 executions used pentobarbital in a three-drug series (15 percent of executions nationwide). Only 13 of these 94 executions used midazolam in a three-drug series (14 percent of executions nationwide).

202.    Put another way, forty-seven of the fifty states punish murder without undertaking the risk of conscious, torturous pain and suffocation which is raised by the use of a chemical paralytic agent and potassium chloride in the three-drug protocol.

203.    It follows that use of the three-drug protocol by Mississippi constitutes cruel and unusual punishment in violation of the Eighth Amendment.

204.    Defendants continued use of a three-drug lethal injection protocol, when other states have abandoned this method in favor of a single-drug, anesthetic-only protocol, violates Plaintiffs' right to be free from cruel and unusual punishment as guaranteed by the United States Constitution.

**C.    Count Three: Execution by nitrogen gas violates the rights of Named Plaintiffs and Putative Class Plaintiffs to be free from cruel and unusual punishment as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution**

205.    The Amended Statute authorizes the use of "nitrogen hypoxia" as the method of execution if selected by the Commissioner, the Deputy Commissioner of Administration and Finance, and the Deputy Commissioner of Institutions.

206.    The Eighth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, prohibits the infliction of superadded pain in the execution of a death sentence.

207.    Because it is nearly impossible to determine with certainty whether a prisoner will suffer serious and needless pain and suffering during an execution, the question of whether a particular execution procedure will inflict such pain and suffering involves an inquiry as to whether the prisoner is subject to a substantial or intolerable risk of serious harm.

208.    Such a substantial or intolerable risk of serious harm may occur when a state lacks a clear protocol for the method of execution, when experience with the procedure demonstrates that there are foreseeable problems, or when it is known that the method will very likely result in the prisoner suffering intense pain that an alternative procedure would not cause.

209.    The Defendants' use of nitrogen hypoxia, a method of execution for which they have not developed a protocol nor conducted any training creates a substantial risk that Plaintiffs will suffer unnecessary and excruciating pain in execution via nitrogen hypoxia.

210.    Further, even if Defendants developed a protocol for nitrogen hypoxia, the use of this method presents risks of severe pain and agony, as alleged in Section IV.H. above, that are substantial in comparison to the one-drug pentobarbital protocol.

211.    There is a feasible alternative which could substantially reduce the risk of severe pain and serious harm presented by execution via nitrogen hypoxia.

212.    The use of a lethal dose of a barbiturate, manufactured under FDA approval, is a feasible and available alternative which would significantly reduce the substantial risk of severe pain presented by Mississippi's current procedure. Other jurisdictions have already moved towards the use of a single-drug anesthetic-only protocol.

213.     In the absence of a supply of a barbiturate in manufactured form, injection of a barbiturate compounded by a duly licensed compounding pharmacy, tested for integrity, purity, and potency by a laboratory unaffiliated with a compounding pharmacy or a department of corrections, and used in a single-drug anesthetic-only protocol (without a paralytic agent or potassium chloride), is a feasible and available alternative which would significantly reduce the substantial risk of severe pain presented by the use of nitrogen hypoxia as a method of execution.

214.     Defendants' refusal to adopt these alternatives for the executions of Plaintiffs, in the face of these documented advantages, without a legitimate penological justification for using nitrogen hypoxia, constitutes cruel and unusual punishment prohibited by the Eighth Amendment.

215.     For the reasons set forth above, Defendants are deliberately indifferent to Plaintiffs' constitutional rights.

216.     This Court has the jurisdiction and authority to enter a declaratory judgment, and a preliminary and permanent injunction to prevent the violations of the Eighth and Fourteenth Amendments alleged in this Count.

**D.     Count Four: Execution by electrocution violates the rights of Named Plaintiffs and Putative Class Plaintiffs to be free from cruel and unusual punishment as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution**

217.     The Amended Statute authorizes the use of electrocution as the method of execution if selected by the Commissioner, the Deputy Commissioner of Administration and Finance, and the Deputy Commissioner of Institutions.

218.     The Eighth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, prohibits the infliction of unnecessary pain in the execution of a death sentence.

219.    Because it is nearly impossible to determine with certainty whether a prisoner will suffer serious and needless pain and suffering during an execution, the question of whether a particular execution procedure will inflict such pain and suffering involves an inquiry as to whether the prisoner is subject to a substantial or intolerable risk of serious harm.

220.    Such a substantial or intolerable risk of serious harm may occur when a state lacks a clear protocol for the method of execution, when experience with the procedure demonstrates that there are foreseeable problems, or when it is known that the method will very likely result in the prisoner suffering intense pain that an alternative procedure would not cause.

221.    The Defendants' decision to use electrocution as their method of execution, given the history of botched executions via electrocution and the evolution of states away from use of electrocution, creates a substantial and intolerable risk that execution via electrocution will inflict cruel and unusual punishment on Plaintiffs.

222.    The Defendants' use of a method of execution for which they have not developed a protocol nor conducted any training creates a substantial risk that Plaintiffs will suffer unnecessary and excruciating pain in execution via nitrogen hypoxia. Defendants have not carried out an execution via electrocution since 1952.

223.    Further, even if Defendants developed a protocol for electrocution, the use of this method presents risks of severe pain and agony, as alleged in Section IV.I. above, that are substantial in comparison to the one-drug pentobarbital protocol.

224.    Thus, Mississippi's use of electrocution as its method of execution creates a substantial risk of serious harm and severe pain to Plaintiffs.

225.    There is a feasible alternative which could substantially reduce the risk of severe pain and serious harm presented by execution via electrocution.

226.    The use of a lethal dose of a barbiturate, manufactured under FDA approval, is a feasible and available alternative which would significantly reduce the substantial risk of severe pain presented by Mississippi's current procedure. Other jurisdictions have already moved towards the use of a single-drug anesthetic-only protocol.

227.    In the absence of a supply of a barbiturate in manufactured form, injection of a barbiturate compounded by a duly licensed compounding pharmacy, tested for integrity, purity, and potency by a laboratory unaffiliated with a compounding pharmacy or a department of corrections, and used in a single-drug anesthetic-only protocol (without a paralytic agent or potassium chloride), is a feasible and available alternative which would significantly reduce the substantial risk of severe pain presented by the use of electrocution as a method of execution.

228.    Defendants' refusal to adopt these alternatives for the executions of Plaintiffs, in the face of these documented advantages, without a legitimate penological justification for using electrocution in executions, constitutes cruel and unusual punishment prohibited by the Eighth Amendment.

229.    For the reasons set forth above, Defendants are deliberately indifferent to Plaintiffs' constitutional rights.

230.    This Court has the jurisdiction and authority to enter a declaratory judgment, and a preliminary and permanent injunction to prevent the violations of the Eighth and Fourteenth Amendments alleged in this Count.

**E.    Count Five: Execution via firing squad violates the rights of Named Plaintiffs and Putative Class Plaintiffs to be free from cruel and unusual punishment as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution**

231.    The Amended Statute authorizes the use of firing squad as the method of execution if selected by the Commissioner, the Deputy Commissioner of Administration and Finance, and the Deputy Commissioner of Institutions.

232.    The Eighth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, and the corresponding provisions of the Mississippi Constitution, prohibit the infliction of unnecessary pain in the execution of a death sentence.

233.    Because it is nearly impossible to determine with certainty whether a prisoner will suffer serious and needless pain and suffering during an execution, the question of whether a particular execution procedure will inflict such pain and suffering involves an inquiry as to whether the prisoner is subject to a substantial or intolerable risk of serious harm.

234.    Such a substantial or intolerable risk of serious harm may occur when a state lacks a clear protocol for the method of execution, when experience with the procedure demonstrates that there are foreseeable problems, or when it is known that the method will very likely result in the prisoner suffering intense pain that an alternative procedure would not cause.

235.    The Defendants' decision to use the firing squad as their method of execution, given the evolution of states away from use of the firing squad, its limited use since 1976, and the gross botches of firing squad executions just this year, creates a substantial and intolerable risk that execution via firing squad will inflict cruel and unusual punishment on Plaintiffs.

236.    The Defendants' use of a method of execution for which they have not developed a protocol nor conducted any training creates a substantial risk that Plaintiffs will suffer unnecessary and excruciating pain in execution via firing squad.

237.    Further, even if Defendants developed a protocol for use of the firing squad, the use of this method presents risks of severe pain and agony, as alleged in Section IV.J. above, that are substantial in comparison to the one-drug pentobarbital protocol.

238.    Thus, Mississippi's use of the firing squad as its method of execution creates a substantial risk of serious harm and severe pain to Plaintiffs.

239.    There is a feasible alternative which could substantially reduce the risk of severe pain and serious harm presented by execution via firing squad.

240.    The use of a lethal dose of a barbiturate, manufactured under FDA approval, is a feasible and available alternative which would significantly reduce the substantial risk of severe pain presented by Mississippi's current procedure. Other jurisdictions have already moved towards the use of a single-drug anesthetic-only protocol.

241.    In the absence of a supply of a barbiturate in manufactured form, injection of a barbiturate compounded by a duly licensed compounding pharmacy, tested for integrity, purity, and potency by a laboratory unaffiliated with a compounding pharmacy or a department of corrections, and used in a single-drug anesthetic-only protocol (without a paralytic agent or potassium chloride), is a feasible and available alternative which would significantly reduce the substantial risk of severe pain presented by the use of the firing squad as a method of execution.

242.    Defendants' refusal to adopt these alternatives for the executions of Plaintiffs, in the face of these documented advantages, without a legitimate penological justification for using the firing squad, constitutes cruel and unusual punishment prohibited by the Eighth Amendment.

243.    For the reasons set forth above, Defendants are deliberately indifferent to Plaintiffs' constitutional rights.

244.    This Court has the jurisdiction and authority to enter a declaratory judgment, and a preliminary and permanent injunction to prevent the violations of the Eighth and Fourteenth Amendments alleged in this Count.

**F.    Count Six: The Amended Statute, on its face and as applied, violates the rights of Named Plaintiffs and Putative Class Plaintiffs to due process and access to the courts guaranteed by the Fourteenth Amendment to the United States Constitution**

245.    As discussed above at IV.A., the Amended Statute gives broad discretion to the Commissioner and the Deputy Commissioners in selecting the method of execution in a particular case.

246.    The Amended Statute only requires that the Commissioner provide the condemned prisoner notice, seven days after receipt of the execution warrant, of the method with which that prisoner will be executed.

247.    In the two executions conducted under the Amended Statute, the condemned prisoners were given the statutory notice twenty-one and nineteen days before their scheduled execution.

248.    Further, in the two executions since the Amended Statute has been in force, Defendant Cain has notified the condemned prisoner that he would be executed by "intravenous injection of a substance or substances in a lethal quantity into the body."

249.    This broad "notice" does not inform the condemned prisoner whether they will be executed by a three-drug protocol using midazolam, a chemical paralytic, and potassium chloride, a one-drug protocol using pentobarbital, or injection of bleach or cyanide.

250.    The combination of the broad discretion given to the Commissioner and Deputy Commissioners to select a method of execution, the late notice given to the condemned prisoner

50

about the method selected, and the vagueness of the notice violates Plaintiffs rights to due process and access to the courts guaranteed by the Fourteenth Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request this Court:

A.    Certify a class action as requested above;

B.    Grant a declaratory judgment that the Amended Statute is facially violative of the Eighth and Fourteenth Amendments;

C.    Grant preliminary and permanent injunctive relief to enjoin the Defendants, their officers, agents, employees, and all persons acting in concert with them from executing Plaintiffs with a three-drug lethal injection protocol consisting of midazolam, a chemical paralytic, and potassium chloride;

D.    Grant preliminary and permanent injunctive relief to enjoin the Defendants, their officers, agents, employees, and all persons acting in concert with them from executing Plaintiffs by use of nitrogen hypoxia;

E.    Grant preliminary and permanent injunctive relief to enjoin the Defendants, their officers, agents, employees, and all persons acting in concert with them from executing Plaintiffs by electrocution;

F.    Grant preliminary and permanent injunctive relief to enjoin the Defendants, their officers, agents, employees, and all persons acting in concert with them from executing Plaintiffs with the firing squad;

G.    Grant preliminary and permanent injunctive relief to enjoin the Defendants, their officers, agents, employees, and all persons acting in concert with them from

executing Plaintiffs without providing full and complete information about the drugs that Defendants intend to use in their execution, within sufficient time for Plaintiffs to raise any statutory or constitutional challenges to the use of said drugs;

H.    Grant preliminary and permanent injunctive relief to enjoin the Defendants, their officers, agents, employees, and all persons acting in concert with them from executing Plaintiffs until such time as Defendants can demonstrate that measures are in place to allow for Plaintiffs' execution in a manner that complies with the Eighth and Fourteenth Amendments to the United States Constitution;

I.    Award costs and attorney's fees pursuant to 42 U.S.C. §1988; and

J.    Grant such other relief that this Court determines to be just and proper in these premises.

Respectfully submitted,

_____
James W. Craig, MSB #7798
Emily M. Washington (pro hac vice pending)
Jack M. Stephens (pro hac vice pending)
The Roderick & Solange MacArthur Justice Center
4400 South Carrollton Ave.
New Orleans, LA 70119
(504) 620-2259 (p)
(504) 208-3133 (f)
jim.craig@macarthurjustice.org
emily.washington@macarthurjustice.org
jack.stephens@macarthurjustice.org

Dated: July 1, 2025